COURT OF APPEALS
DECISION
DATED AND FILED

April 4, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP2003-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2005CF13**

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JASON B. HELMEID,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Pepin County: THOMAS W. CLARK, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jason B. Helmeid appeals from a circuit court order revoking his conditional release from the custody of the Department of

Health Services (the department) and returning him to institutional care. Helmeid argues that the State failed to meet its burden to prove either that he had violated any rule or condition of his conditional release or that "the safety of [himself] or others requires that conditional release be revoked." *See* WIS. STAT. § 971.17(3)(e) (2021-22).[1] We conclude that the evidence the State presented at Helmeid's revocation hearing was sufficient to support revocation of Helmeid's conditional release. Accordingly, we affirm.

## BACKGROUND

¶2 In 2005, the State charged Helmeid in a criminal complaint with two counts of second-degree sexual assault of a child under sixteen years of age. The complaint alleged that the fifteen-year-old victim was visiting her friend's home when Helmeid trapped her in the bathroom, held her hands behind her back, touched her breasts over her clothing, and then put his hand inside her pants and touched her vaginal area. The victim was "scared" and tried to get away from Helmeid. Eventually, the victim began kicking the washer and dryer located in the bathroom, and the owner of the home used a key to enter the bathroom and told Helmeid to "get out." A few months later, the victim was again visiting her friend, and Helmeid approached her outside the home and touched her breasts, buttocks, and vagina before "rubbing his penis against [the victim's] body." Law enforcement was subsequently contacted.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted. We note that a portion of WIS. STAT. § 971.17 has been amended since the State filed its petition to revoke Helmeid's conditional release. *See* 2021 Wis. Act 131, § 53. Because the amendments do not impact the sections of the statute at issue in this case, however, we will cite to the 2021-22 version of the statute.

¶3     Helmeid pled not guilty by reason of mental disease or defect (NGI) to one count of second-degree sexual assault of a child.  As to the second count, Helmeid pled guilty to an amended charge of fourth-degree sexual assault, a misdemeanor.  Helmeid was committed to the custody of the department for a period of twenty-five years.  In 2006, the circuit court ordered Helmeid's conditional release, as well as two years of probation on the misdemeanor conviction.

¶4     Since that time, Helmeid's conditional release has been revoked and reinstated multiple times.  On May 25, 2021, the department filed a statement of probable cause for detention and petition for revocation of conditional release with the circuit court, which is the operative petition for the purpose of this appeal.[2] That petition alleged the following:

> On or around 5/14/21, Jason Helmeid made lewd sexual comments towards [a] female who clearly appeared underage.  This behavior is in violation of CSPR003 and 4 of the Rules of Supervision signed by him.
>
> On or about 5/14/21, Jason Helmeid did get into a physical altercation at the Stable Living Group Home.  This behavior is in violation of CSPR003 signed by him.
>
> On or about 5/18/21, Jason Helmeid did urinate in the juice for the group home and placed it back in the refrigerator.  This behavior is in violation of CSPR003 of the Rules of Supervision signed by him.
>
> On or about 5/18/21, Jason Helmeid rubbed a piece of pizza on his genitals and fed it to another resident of the group home.  This behavior is in violation of CSPR003 of the Rules of Supervision signed by him.

---

[2] The operative conditional release order was issued on February 4, 2019, and amended on March 27, 2020, to remove some privileges and impose additional monitoring and treatment.

> Since on or before 5/18/21, Jason Helmeid has been abusive towards his dog. This behavior is in violation of CSPR003 of the Rules of Supervision signed by him.

¶5 The circuit court held a hearing on the petition on August 2 and 3, 2021. On the first day, the State called Sherfeng Vue—Helmeid's case manager, who works for Lutheran Social Services on behalf of the department. Vue testified that he helps "supervise [Helmeid's] conditions that [have] been set by the [c]ourt to make sure he follows his conditions and connect and support him out in the community." Vue had filed a supplement to the State's petition "in support of [his] belief" and the department's belief that "Helmeid has violated the terms of his conditional release, that his conditional release should be revoked[,] and [that] he should be returned to the institution at Winnebago." However, when it became apparent that Vue had not personally observed any of Helmeid's alleged violations, the court adjourned the hearing so the State could call the appropriate witnesses to testify.

¶6 The hearing continued the next day, and the State called Zachary Argo—the house manager at Stable Living, where Helmeid was residing before revocation of his release. Argo explained that his role is to ensure that the residents of the facility adhere to their rules of supervision, to report any behavior outside of those rules or any misconduct, to make sure they take their medications, to transport them to appointments, and to otherwise assist with their daily tasks. If a resident violates his rules of supervision, Argo creates an incident report and sends that report to the individual's case manager and probation and parole officer.

¶7 Argo testified about the alleged rule violations Helmeid committed. First, Argo recounted that on one occasion, he, Helmeid, and the other two residents of Stable Living were driving to an appointment when Helmeid made

4

"lewd comments" about two "visually underage girls." According to Argo, the girls appeared to be "10-year olds," and when Helmeid saw them he stated, "I want to get me some of that," which was clearly "alluding to … a sexual thing." Argo responded by stating "that's just not right … that's unacceptable." Helmeid's "housemates even chimed in and were like, why would you say that?" Helmeid grew argumentative, explaining that "nobody should tell me what I can say" and that the girls were "not underage."

¶8   On another occasion, Argo and Helmeid were in the car when they passed a "young girl with her mom," and Helmeid stated, "[D]amn, she's sexy" and then added that she had "a nice back end." Argo responded, "[T]hat's literally a 12-year-old, [Helmeid]; what the fuck are you saying?" Helmeid again became argumentative, stating that "it's nobody's business but mine who I'm looking at."

¶9   Argo further reported that he "repeatedly" saw Helmeid try to get into "physical altercations" with his fellow housemates. And it was reported to Argo, as the house manager, that Helmeid got into a physical altercation with another Stable Living staff member. According to Argo, he received a call reporting that the staff member discovered that Helmeid was urinating into apple juice bottles and trying to make a housemate drink it, but when the staff member questioned Helmeid about it, Helmeid attempted to attack the housemate and began "pushing" the staff member. Argo arrived at Stable Living to find Helmeid sitting next to the housemate "laughing hysterically," and when Argo asked Helmeid why he was laughing, he admitted that the housemate "just drank my urine." Helmeid continued, "I have been peeing in the bottles and feeding it to him." Helmeid also told Argo that "he had been taking and wiping the other resident's pizza in between his butt cheeks and his balls and then feeding [it] to the resident."

¶10 During closing arguments, the prosecutor argued for revocation of Helmeid's conditional release. The prosecutor observed that Helmeid was committed to the department's care based on an NGI plea to a charge of second-degree sexual assault of a child. As a result, and due to Helmeid's continued "lack of insight regarding the appropriateness of having sexual thoughts about underage girls," the prosecutor reasoned that Helmeid "is not in a condition that is going to assure public safety if he is allowed to remain in the community." The prosecutor also argued that Helmeid's acts of feeding his housemates urine and pizza that Helmeid rubbed on his buttocks and genitals supported the conclusion that "Helmeid's adjustment to living in the community has not been successful to this point." According to the prosecutor, these acts not only posed "a danger" to the affected housemates, but they also showed that "Helmeid's criminal thinking has not changed."

¶11 The circuit court first addressed the allegations that Helmeid made sexual comments about young girls. The court found that it would accept Argo's testimony that "these were clearly underage females around 10 years old." The court noted that the comments Helmeid made about the young girls violated his conditional release rules. The court then addressed Helmeid's reaction when he was confronted about the comments, observing that Helmeid's comments evidenced a "clear lack of progress" toward successfully adjusting to conditional release. Given that lack of progress, the court expressed a "concern about the safety of the public." Accordingly, the court determined that the comments both violated Helmeid's rules of supervision and "show[ed] a concern for the safety of others."

¶12 Further, the circuit court found that urinating into bottles to have his housemate drink the urine "clearly is a safety concern." According to the court,

6

"deceiving [a] fellow resident into drinking urine could certainly have [an] impact on their health and would also be a violation of [Helmeid's] behavioral rules." The court also addressed Argo's testimony that Helmeid engaged in physical altercations with both staff and fellow residents, concluding that this behavior "would also be a threat to the safety of others at Stable Living." The court concluded that the State had met its burden and revoked Helmeid's conditional release. Helmeid appeals.

## DISCUSSION

¶13 A defendant who has been adjudicated NGI is committed to the department for a specified period. WIS. STAT. § 971.17(1). As part of this commitment, the circuit court must determine whether either institutional care or conditional release is warranted. Sec. 971.17(3)(a). If the court places a defendant in institutional care, he or she may later petition for conditional release after six months. Sec. 971.17(4)(a). "If the court finds that the person is appropriate for conditional release," then the department will "prepare a plan that identifies the treatment and services, if any, that the person will receive in the community." Sec. 971.17(4)(e)1. A conditionally released individual "is subject to the conditions set by the court and to the rules of the department of health services." Sec. 971.17(3)(e).

¶14 Relevant to this appeal, the department may revoke an NGI committee's conditional release pursuant to WIS. STAT. § 971.17(3)(e). Under that paragraph, "[i]f the department of health services alleges that a released person has violated any condition or rule, or that the safety of the person or others requires that conditional release be revoked, he or she may be taken into custody under the rules of the department." *Id.* At the revocation hearing, the State "has the burden

7

of proving by clear and convincing evidence that any rule or condition of release has been violated, or that the safety of the person or others requires that conditional release be revoked." *Id.* If the court determines that the State met its burden, then it may revoke the order for conditional release and order placement in institutional care. *Id.*

¶15 In this case, Helmeid argues that the State failed to meet its burden of proving by clear and convincing evidence that he either violated a rule or condition of his conditional release (the rule violation ground) or "that the safety of the person or others requires that conditional release be revoked" (the safety ground). *See id.* For the reasons that follow, we disagree.

¶16 First, Helmeid questions the appropriate standard of review we are to apply in this case. He claims that "[t]he Wisconsin courts have not addressed the proper standard for reviewing a circuit court's decision to revoke conditional release under WIS. STAT. § 971.17(3)(e)." Nevertheless, he claims "that the most appropriate standard" is the standard applied in ***Langlade County v. D.J.W.***, 2020 WI 41, ¶¶23-25, 391 Wis. 2d 231, 942 N.W.2d 277, which states that we are to review the court's decision on a mental commitment as a mixed question of fact and law. Although the State disagrees that our courts have not addressed this issue—citing ***State v. Jefferson***, 163 Wis. 2d 332, 338, 471 N.W.2d 274 (Ct. App. 1991)—the State agrees that when reviewing a decision revoking an NGI committee's conditional release under WIS. STAT. § 971.17(3)(e), we are to accept the court's findings of fact unless clearly erroneous. ***Jefferson***, 163 Wis. 2d at 338. However, the court's "application of those facts to the law, such as recommitment for dangerousness … is a question of law which appellate courts review independently from the [circuit] courts." *Id.* We conclude that the parties

have agreed on the appropriate standard, and we will apply that standard to this case.

¶17 Next, Helmeid argues that the State failed to meet its burden to prove the rule violation ground of WIS. STAT. § 971.17(3)(e) because Helmeid's actual rules and conditions of his conditional release were never introduced into evidence at the revocation hearing. The State concedes this fact on appeal and "does not argue that there was sufficient evidence to establish that Helmeid violated his rules or conditions of release." We agree that the State did not meet its burden to prove the rule violation ground in this case, and we therefore will address this ground no further.[3]

¶18 On the safety ground, Helmeid first claims that the State's petition did not allege the safety ground as a basis to revoke his conditional release. Citing *State v. Mahone*, 127 Wis. 2d 364, 370, 379 N.W.2d 878 (Ct. App. 1985), Helmeid argues that there are certain procedural due process guarantees provided to NGI committees. He claims that the "[m]ost relevant here is the second on the *Mahone* list, that the person be given 'written notice of the claimed violation.'" *See id.* According to Helmeid, "[t]he State did not allege that 'the safety of

---

[3] We pause here to note that some of Helmeid's arguments on appeal—indeed, perhaps even the entire appeal—could have been avoided if the State had properly presented its case before the circuit court. The State's pleadings and proof with regard to its petition to revoke Helmeid's conditional release were poorly crafted and incomplete. Just like a commitment under WIS. STAT. ch. 51, there are "important liberty interest[s] at stake" for NGI committees. *See Langlade County v. D.J.W.*, 2020 WI 41, ¶43, 391 Wis. 2d 231, 942 N.W.2d 277. "Freedom from physical restraint is a fundamental right that 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'" *Id.*, ¶42 (citations omitted). Thus, hearings and the procedures used to revoke conditional release "cannot be perfunctory under the law. Attention to detail is important." *See Outagamie County v. Melanie L.*, 2013 WI 67, ¶94, 349 Wis. 2d 148, 833 N.W.2d 607 (discussing involuntary medication orders).

[Helmeid] or others requires that conditional release be revoked.'" Instead, he argues, "[t]he State only alleged that Helmeid had violated various rules of supervision." Thus, given that the safety ground served as a basis for the circuit court's decision to revoke his conditional release, Helmeid claims his due process rights were violated.

¶19    In response, the State argues that Vue's supplement to the petition for revocation "plainly alleged dangerousness," and, therefore, Helmeid's argument on this point fails.[4]  As noted above, Vue filed a Conditional Release Adjustment Summary for Helmeid (Vue's supplement) on June 9, 2021, and copies were sent to all interested parties.[5]  Vue's supplement recounted Helmeid's most recent rule violations and noted that "Helmeid has struggled with his mental health and sexual thoughts and behaviors."  Vue explained that Helmeid's treatment team took steps to help Helmeid succeed on conditional release—including "increased engagement in sex offender treatment, increased supervision levels at the group home, removal of independent community time privileges, prior approval for visits from relatives and removal of his vehicle at the group home"—but he noted that those "interventions" "have not been successful in the community."  Vue concluded by stating, "Due to Mr. Helmeid's recent behaviors, the treatment team believes that if he remains in the community, there is the

---

[4]  We question whether Helmeid forfeited this notice issue.  Our review of the record on appeal does not reveal that Helmeid raised this issue before the circuit court at the hearing, and the parties' arguments before this court do not otherwise suggest that this issue was presented to the circuit court. *See Schonscheck v. Paccar, Inc.*, 2003 WI App 79, ¶¶10-11, 261 Wis. 2d 769, 661 N.W.2d 476.  Nevertheless, the State does not argue forfeiture before us; therefore, we will address the merits of the notice issue.

[5]  We note that Vue also testified at the hearing, Vue's supplement was referenced during his testimony, and the parties both addressed it in their respective arguments before the circuit court.

potential serious risk to his own personal safety and to the safety of other residents and the community."

¶20     We agree that Helmeid was provided with sufficient notice that the State intended to proceed under the safety ground.  First, we agree with the State that Vue's supplement plainly alleged dangerousness.  Second, Helmeid's counsel obviously read Vue's supplement—which contained information in support of a finding that Helmeid violated the safety ground and not just his conditional release rules—because he referenced Vue's statements in his closing remarks.  Third, the State's standard form petition clearly referenced WIS. STAT. § 971.17(3)(e), and it stated the specific facts the State planned to present in support of its request for revocation.  Under these circumstances, the State provided "written notice of the claimed violation."  *See Mahone*, 127 Wis. 2d at 370.  The facts alleged in the petition supported revocation on the safety ground, not just the rule violation ground.

¶21     Finally, Helmeid fails to explain how his due process rights were affected by any lack of specificity in the State's petition.  For example, he does not make any claim that he was unprepared or would have offered different or additional proof if he had been provided with a clearer statement that the State intended to prove the safety ground using the same facts alleged.  The statute is clear that conditional release can be revoked based upon either a rule violation or if the safety of Helmeid or others requires it.  The State's petition, as well as Vue's supplement, clearly notified Helmeid of what the State intended to prove. Helmeid's due process rights were not violated.

¶22     Finally, Helmeid argues that the State failed to introduce sufficient evidence on the safety ground to support a finding that his conditional release

11

should be revoked. He first claims that "Wisconsin courts have not had occasion to address the meaning of the phrase 'the safety of the person or others' in WIS. STAT. § 971.17(3)(e)." He suggests that it should mirror the standard for *denying* conditional release. Accordingly, he claims:

> the [circuit] court may consider, without limitation because of enumeration, the nature and circumstances of the crime, the person's mental history and present mental condition, where the person will live, how the person will support himself or herself, what arrangements are available to ensure that the person has access to and will take necessary medication, and what arrangements are possible for treatment beyond medication.

*See* § 971.17(3)(a), (4)(d). Further, he argues that the court should then also consider whether there is a "significant risk of bodily harm to [the person] or others" if conditional release is not revoked, *compare* § 971.17(3)(a), (4)(d), *with* § 971.17(3)(e), asserting that "[t]here is no rational reason to apply different standards for denying and revoking conditional release."

¶23 The State agrees with Helmeid that WIS. STAT. § 971.17(3)(e) "does not specify the factors relevant to the [circuit] court's dangerousness determination" but that "other provisions within … § 971.17 fill in the gaps." It also agrees that the factors enumerated under § 971.17(3)(a) and (4)(d) are relevant considerations. The State does not agree, however, with Helmeid's contention that the "safety of the person or others" under § 971.17(3)(e) is the same as the "significant risk of bodily harm" standard contained in other parts of the statute. As the State argues, the plain language of § 917.17(3)(a) and (4)(d) clearly provide that the "significant risk of bodily harm" standard applies when determining whether to *grant* conditional release; however, the standard for *revoking* conditional release under § 971.17(3)(e) considers only "the safety of the person or others."

12

¶24 We conclude that we need not decide which is the proper standard because the State has met its burden of proof under either standard. First, Helmeid repeatedly expressed sexual interest in, and sexual objectification of, pre-teen girls. Helmeid's initial convictions—and the reason for his commitment—were for sexual offenses against a fifteen-year-old child. We conclude that the circuit court reasonably considered Helmeid's criminal history of forcible sexual contact with a child in finding that his subsequent lewd comments toward young girls were evidence of the significant risk of bodily harm he continued to pose to others.

¶25 Further, when Helmeid was confronted about his comments by both of his housemates and Argo, he was argumentative, stating that his sexual thoughts about children were "nobody's business." He then argued that the girls were "not underage." We agree with the State that Helmeid's response is "particularly concerning" because it "shows that Helmeid is well aware that his sexual objectification of children is wrong. Yet he continues to do so and refuses to acknowledge the impropriety of his actions." *See State v. Randall*, 2011 WI App 102, ¶¶25-29, 336 Wis. 2d 399, 802 N.W.2d 194 (explaining that Randall had refused to take responsibility for repeated rule violations and concluding that "Randall's devious, secretive and intentional rule-breaking behavior, similar to his behavior at the time of his crimes, demonstrates that he continues to be dangerous").

¶26 Helmeid's arguments in response are unpersuasive. Helmeid contends that that State failed to show that he would act on his "articulation of pedophilic interests." However, the State was not required to do so. *See State v. Burris*, 2004 WI 91, ¶72, 273 Wis. 2d 294, 682 N.W.2d 812 ("A court is not forced to wait until overtly dangerous acts have been committed; it is not required to ignore indications that a sexually violent person has disregarded the rules

repeatedly in the past and will do so in the future."). Further, Helmeid suggests that the girls were not, in fact, underage or that it was unclear whether Helmeid was talking about the mother or the daughter in his second remarks. However, the circuit court's finding that Helmeid had referenced underage females in making the sexual comments was not clearly erroneous. Helmeid does not present an argument to the contrary.

¶27 Next, the State presented evidence that Helmeid engaged in dangerous acts of physical aggression while on conditional release. For example, Argo testified that he "repeatedly" saw Helmeid try to instigate "physical altercations with the other resident[s] all the time." Further, Argo explained that when a Stable Living staff member questioned Helmeid about urinating into his housemate's apple juice, Helmeid attempted to physically attack the housemate and then pushed the staff member who "tried to get in the way of him attacking this other resident." According to Helmeid, this incident—while also being based on hearsay evidence—is "too isolated and innocuous to be the basis for the conclusion that he posed a 'significant risk of bodily injury.'" But the circuit court found credible Argo's testimony that he repeatedly saw Helmeid try to get into physical altercations with his fellow housemates, which clearly posed a significant risk of bodily injury to those individuals.

¶28 Finally, the State presented evidence that Helmeid engaged in acts likely to negatively impact his housemates' health. As noted, the evidence revealed that Helmeid had been "peeing in apple juice bottles and feeding it to" his housemate, which Helmeid admitted to Argo while "laughing hysterically." Helmeid also admitted to "taking and wiping the other resident's pizza in between his butt cheeks and his balls and then feeding [it] to the resident." Helmeid argues that these acts are best characterized as "juvenile" and "sophomoric pranks" and

that "there was no evidence that they rose to the level of a 'significant risk of bodily injury.'" He explained that "[a]t most [these acts] demonstrated an immature sense of humor, not a reason to confine a person to a mental institution." However, we agree with the circuit court's finding that this behavior was "clearly a safety concern" that "could certainly have [an] impact on [the housemates'] health." There is no question that ingesting another person's fecal matter or urine could expose the victim to any number of serious health risks.[6]

¶29 In conclusion, Helmeid's attempts to minimize the risk he poses to others and the harm he caused to them are unpersuasive. We disagree that Helmeid's behavior could be properly characterized as just a young man playing pranks on others. Helmeid's inappropriate sexual comments about young girls, given his past criminal history and subsequent failure to take responsibility for his behavior, clearly caused the circuit court to properly conclude that Helmeid posed a significant risk to others. Helmeid's "pranks" and physical altercations with other residents in his group home appropriately led the court to the same conclusion. We agree with those conclusions. Further, Helmeid's inability to take responsibility for his actions, as well as his escalating anger, were suitable considerations in determining that Helmeid had not adjusted well to life on conditional release and that his conditional release should be revoked to protect the community.

---

[6] We note, for the record, that Helmeid also argues that the circuit court "did not consider any of the relevant statutory factors" under WIS. STAT. § 971.17(3)(a). However, pursuant to the plain language of the statute, the factors are non-exhaustive and the court *may*, but it is not required to, consider those factors. Sec. 971.17(3)(a); *see also State v. Klapps*, 2021 WI App 5, ¶39 n.10, 395 Wis. 2d 743, 954 N.W.2d 38 (2020); *State v. Randall*, 2011 WI App 102, ¶16, 336 Wis. 2d 399, 802 N.W.2d 194.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.